**To Be Filed Under Seal**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

————————————————————————x

IN RE GRAND JURY SUBPOENA

19 Misc. 149 (CM)

————————————————————————x

**SEALED MEMORANDUM DECISION AND ORDER GRANTING**
**THE GOVERNMENT'S APPLICATION TO MODIFY THE PROTECTIVE ORDER**

McMahon, C.J.:

The Government has filed an application for modification of a March 18, 2016 pretrial

protective order, entered by the late Hon. Robert W. Sweet in a civil defamation action, *Giuffre*

*v. Maxwell*, No. 15-cv-7433 (S.D.N.Y.) ("the *Giuffre* Action"), in order to permit the law firm of

Boies Schiller Flexner LLP ("Boies Schiller") to comply with a grand jury subpoena.

The application is granted.

**I.      Background**

**A.      The Protective Order**

In September 2015, Virginia L. Giuffre commenced a civil suit against Ghislaine

Maxwell, alleging that Maxwell had defamed Giuffre by stating that Giuffre was not the victim

of sex crimes perpetrated by, among others, Maxwell and Jeffrey Epstein ("Epstein").  (15-cv-

7433, Dkt. No. 1.)  Boies Schiller represented the plaintiff in the litigation, and continues to

represent her on a pending post-settlement appeal, which is described below.

On March 3, 2016, Maxwell moved before the assigned judge, the Hon. Robert W.

Sweet, for entry of a protective order for materials produced in discovery.  Maxwell cited

To Be Filed Under Seal

statutory and common law privacy concerns.  (Dkt. No. 38 at 1.)  Maxwell submitted a proposed

form of order for Judge Sweet's consideration.  (Dkt. No. 39-1.)

Giuffre represented that she "[did] not oppose the entrance [*sic*] of a Protective Order in

this case, but [did] oppose a Protective Order in the form proposed by Defendant because it is

overly broad and can lead to abuse and over designation[.]"  (15-cv-7433, Dkt. No. 40 at 2.)

Giuffre redlined Maxwell's proposed protective order, deleting some provisions and (insofar as

is relevant) adding language to paragraph 4—stating that confidential information "shall not be

disclosed or used for any purpose except the preparation and trial of this case"—to provide that

confidential materials also could be disclosed with impunity "in any related matter, including but

not limited to, investigations by law enforcement."  (15-cv-7433, Dkt. No. 41-5 ¶ 4.)  Maxwell

opposed these modifications.  (15-cv-7433, Dkt. No. 49.)

At a hearing held on March 17, 2016, Judge Sweet concluded that "of course" a

protective order was warranted.  (Hrg. Tr., 15-cv-7433, Dkt. No. 66, at 4:25–5:1.)  He gave no

reason, but as Maxwell made her motion on the basis of privacy concerns, and Giuffre consented

to entry of some form of a protective order for the same reason, I assume that Judge Sweet found

privacy concerns to constitute good cause—which, given the subject matter of the lawsuit, would

certainly have been warranted.

Judge Sweet did not, however, resolve any of the disputes between the parties about what

should or should not be in the order.  Instead, he directed the parties to come up with an

agreement to which everyone could stipulate.  (*Id.* at 5:1–12.)  By the end of the hearing, Giuffre,

who was eager to take Maxwell's deposition, agreed to the form of order originally proposed by

Maxwell.  (*Id.* 9:7–24.)  The court agreed that it would "so order" Maxwell's proposed version

To Be Filed Under Seal

pursuant to the parties' stipulation. Judge Sweet made no specific findings about any provision of that order. (*Id.* 9:25–10:6.)

On March 18, 2016, the court formally entered the Protective Order. (15-cv-7433, Dkt. No. 62.) It provided, as such orders generally do, that any documents, materials and/or information designated confidential by the parties (the "Confidential Materials") would be subject to the protections of, and could be disclosed to non-parties only in accordance with the terms of, the Protective Order. (*Id.* ¶¶ 1–5.) The Protective Order also required all parties, at the conclusion of the case, either to return to the party who made the confidentiality designation, or (in the alternative) to destroy, each document and all copies of Confidential Materials in their possession. (*Id.* ¶¶ 5-7, 12.) This destruction obligation extended to the parties' lawyers as well as to the parties themselves. (*Id.* ¶ 12.)

The Protective Order specified that if Confidential Materials were contained in any document presented to the court, the filing "shall be accompanied by a Motion to Seal pursuant to Section 6.2 of the Electronic Case Filing Rules & Instructions for the Southern District of New York." (*Id.* ¶ 10.) The docket sheet in *Giuffre v. Maxwell* reveals that such motions were frequently made and routinely granted. As a result, a vast amount of the *Giuffre* Action was conducted, in effect, in secret—despite the fact that there was immense public interest in the matter.

The *Giuffre* Action was settled and dismissed with prejudice pursuant to a joint stipulation for dismissal on May 25, 2017, which was shortly before the trial was to begin. (15-cv-7433, Dkt. No. 919.) The terms of the settlement remain confidential. (15-cv-7433, Dkt. No. 953 at 10.)

To Be Filed Under Seal

B.      **Attacks on the Protective Order**

Both during and after the settlement of the *Giuffre* Action, third parties made highly-publicized applications to have documents that were filed under seal by order of Judge Sweet unsealed and made public. (15-cv-7433, Dkt. Nos. 362, 550, 935.)  Harvard Law professor and criminal defense lawyer Alan Dershowitz, whom Giuffre publicly alleged of perpetrating sex crimes alongside Epstein, moved to unseal a limited portion of the record in order to clear his name. (15-cv-7433, Dkt. No. 364 at 1.)  Alt-right activist and provocateur Michael Cernovich also sought to unseal the papers filed as part of Maxwell's motion for summary judgment, arguing, "Cernovich Media cannot conduct its Forth [*sic*] Estate function if this Court allows the Parties to conduct their dispute outside of the normal sunlight of transparency and accessibility." (15-cv-7433, Dkt. No. 551 at 1.)  The Miami Herald Media Company and investigative journalist Julie Brown, whose feature story about Epstein recently garnered significant public interest, also moved post-settlement to unseal the entire record. (15-cv-7433, Dkt. No. 936.)

All such applications were denied by Judge Sweet. (15-cv-7433, Dkt. Nos. 439 (sealed), 892, 953.)  A consolidated appeal from the orders denying the unsealing motions is currently pending before the Second Circuit. *Giuffre v. Maxwell*, No. 18-2868 (2d Cir.).  On March 6, 2019, the Court of Appeals heard argument on the consolidated appeal, which was widely covered in the legal press. I think it is fair to say that during the argument, the panel seemed critical of the district court's failure to make specific findings about why any particular document as to which unsealing was sought should remain sealed.  For example, Circuit Court Judge Jose A. Cabranes stated that Maxwell's lawyer "[couldn't] possibly be serious" when he argued that no documents should be made public, even after the case had settled.[1]

---

[1]      Priscilla DeGregory, *Documents related to pedophile Jeffrey Epstein may be unsealed*, N.Y. Post (Mar. 6, 2019), https://nypost.com/2019/03/06/documents-related-to-pedophile-jeffrey-epstein-may-be-unsealed/.

Shortly after the oral argument, the Court of Appeals issued an unusual order, giving the parties to the appeal ten days to explain why all papers submitted in connection with Maxwell's unsuccessful motion for summary judgment should not immediately be unsealed. (18-2868, Dkt. No. 138.) The docket reveals that responsive filings were in fact delivered to the Court of Appeals; no further order has been entered in the Second Circuit.

The consolidated appeal relates only to the unsealing of what would, but for the Protective Order and Judge Sweet's repeated decisions to permit materials to be filed under seal and his refusal to unseal those materials on the motions of the Intervenors, be publicly available in the files of the court. They do not address materials that may be in the files of the parties or their counsel.

## C.     The Government's Application

In late November or early December 2018, the Government commenced an investigation into Epstein and others for unlawfully trafficking minors, in violation of 18 U.S.C. §§ 1591, 1594(c) and unlawfully enticing minors in violation of 18 U.S.C. § 2422(b). (Sealed Aff. and Appl. of AUSA Alex Rossmiller dated Feb. 5, 2019 ("Gov't Appl."), Dkt. No. 1, ¶ 3.)

As part of that investigation, the Government issued a subpoena to Boies Schiller "requiring the production of copies of discovery and related materials in [the *Giuffre* Action]." (Gov't Appl., ¶ 5.) These materials are arguably subject to the Protective Order.

On February 5, 2019, the Government made an *ex parte, in camera* application to Judge Sweet under the All Writs Act, 28 U.S.C. § 1651(a), seeking to relieve Boies Schiller from the Protective Order so that it could respond to the subpoena. The Government represented in that application that Boies Schiller was willing to comply with the subpoena but for the Protective

Order. (Letter from AUSA Alex Rossmiller to the Hon. Robert W. Sweet, dated Feb. 28, 2019 ("Gov't Letter Br."), Dkt. No. 2, at 1.)

Judge Sweet asked for further briefing. On February 28, 2019, the Government submitted a letter brief *in camera*, to which it appended a copy of the Protective Order and a proposed order granting the relief requested. (*See* Gov't Letter Br.) Neither the initial application nor the subsequent letter brief was initially filed with the Clerk of Court.

Prior to ruling on the Government's application, Judge Sweet died. The open application was referred to me.

I directed that a miscellaneous docket number be assigned to the Government's application and that all materials theretofore sent to Judge Sweet's chambers be filed under seal.[2]

I also held two conferences in which I questioned the U.S. Attorney's Office about the application.

## II.     The Government's Application, While Irregular, Is Granted

### A.     Procedural Irregularities Attendant to This Application

In the ordinary course, one would expect this application to arise in a different procedural posture.

First, one would have expected Boies Schiller, the recipient of the subpoena, to have either (1) moved for relief from the Protective Order, or (2) moved to quash the subpoena. *See In re Grand Jury Subpoena Duces Tecum Dated Apr. 19, 1991*, 945 F.2d 1221, 1225 (2d Cir. 1991) ("The proper procedure . . . is . . . to subpoena the deposition transcripts for use in a pending proceeding such as a grand jury investigation or trial, in which the issue could be raised

---

[2]     All materials under this docket number, 19-mc-149, including this opinion, will be kept under seal as related to a pending grand jury investigation.

by motion to quash or modify the subpoena . . . or to seek permissive intervention in the private

action.") (internal quotations omitted); *but see Palmieri v. State of N.Y.*, 779 F.2d 861, 862 (2d

Cir. 1985) (considering appeal where the New York State Attorney General, rather than the

subject of the subpoena, was the moving party).

During the conference, the Government was not able to explain why it, rather than Boies

Schiller, made the application. Boies Schiller is perfectly capable of protecting its own interests.

The law firm's failure to seek for itself permission to respond to the subpoena seems particularly

mysterious in light of the fact that it has filed papers on behalf of Giuffre, in both the district and

appellate proceedings, supporting the intervenors' applications to unseal the entire record. *See,*

*e.g.*, Br. for Pl.-Appellee Virginia L. Giuffre, *Giuffre v. Maxwell*, No. 18-2868 (2d Cir. Dec. 27,

2018), ECF No. 83 at 1 ("Ms. Giuffre . . . is now prepared to have the world see what the record

contains."). I suppose that Boies Schiller might not want to seem too cooperative with the

Government, especially if it is concerned about ending up as a defendant in a lawsuit alleging

breach of contract if it has failed to return or destroy the Confidential Materials in its possession.

*See Aioi Nissay Dowa Ins. Co. v. ProSight Specialty Mgmt. Co.*, No. 12-cv-3274, 2012 WL

3583176, at *6 (S.D.N.Y. Aug. 21, 2012). But that does not strike this Court as a reason for the

Government to carry the firm's water—the moreso because Judge Sweet ruled some months

before he died that the intervenors' appeals in *Giuffre* meant the lawsuit had not "concluded,"

and so had postponed the day when that contractual obligation kicked in. (15-cv-7433, Dkt. No.

967 at 6.)[3]

---

[3]     This ruling came in response to a motion by Maxwell to compel Giuffre's compliance with the document
destruction provision. It argued that Giuffre's obligations thereunder were triggered at the time of settlement. (15-
cv-7433, Dkt. Nos. 957.) Judge Sweet denied that motion in light of the pending appeals. (15-cv-7433, Dkt. No.
967).

Alternatively, the Government could have moved *ex parte* for permissive intervention in the *Giuffre* Action, and then sought modification of the Protective Order. Permissive intervention is the appropriate procedural device when any non-party seeks to modify a protective order. *AT&T Corp. v. Sprint Corp.*, 407 F.3d 560, 562 (2d Cir. 2005) ("We have stated that permissive intervention is the proper method for a nonparty to seek a modification of a protective order."); *H.L. Hayden Co. of New York v. Siemens Med. Sys., Inc.*, 797 F.2d 85, 90 (2d Cir. 1986) ("[W]e continue to adhere to our holding in *Martindell* [*v. International Tel. and Tel. Corp.*, 594 F.2d 291, 294 (2d Cir. 1979)], that 'this extraordinary writ [mandamus] would hardly be available . . . where the only purpose was to obtain modification of a pretrial order for investigative purposes.'"). Or it could have filed a writ of mandamus, since "mandamus lies to compel a judge to unseal documents shown to be material and necessary in litigation," *United States v. Davis*, 702 F.2d 418, 423 (2d Cir. 1983). But the Government has done neither of the above; instead, it has moved pursuant to the All Writs Act. It cites no authority for that procedure.

Nonetheless, there is precedent in this Circuit for granting procedurally puzzling applications by the Government to unseal materials for use by a grand jury. For example, in *Davis*, 702 F.2d 418, the Government, which was not a party to the underlying civil litigation, successfully "moved the Bankruptcy Court for an order permitting it access to the materials under seal," including transcripts of examinations taken under Rule 205 and exhibits marked at those examinations. *Id.* at 420–21. On appeal, the Second Circuit rejected the defendant-appellants' argument that the bankruptcy court had abused its discretion in granting the Government's application: "A court may direct access to such material upon a proper showing of

need. Here such a showing was amply demonstrated. To have refused access to these records in the face of a subpoena from a grand jury would have been an abuse of discretion." *Id.* at 423.

I will, therefore, consider the Government's application.

### B.     The *Martindell* Standard Applies

Ordinarily, "Where there has been reasonable reliance by a party or deponent, a District Court should not modify a protective order granted under Rule 26(c)." *S.E.C. v. TheStreet.Com*, 273 F.3d 222, 229 (2d Cir. 2001). However, the Second Circuit established a limited exception to this rule in *Martindell v. International Tel. and Tel. Corp.*, 594 F.2d 291 (2d Cir. 1979).

*Martindell* arose after the Government made an informal, telephonic request to the district court in a stockholder derivative suit for access to deposition transcripts, which were subject to a protective order and which the Government planned to use in a criminal investigation. *Id.* at 293. The district court denied the Government's request to modify the protective order to enable it to access the transcripts. *Id.* Affirming the lower court, the Second Circuit reasoned that, when the Government moves to modify a protective order, it is especially appropriate to require a higher showing, because the Government both (i) possesses extraordinary police powers that it can use to obtain the information in other ways, and (ii) typically seeks the information "in the context of a public investigation in which the assertion of a privilege might be of critical importance." *In re Agent Orange Prod. Liab. Litig.*, 104 F.R.D. 559, 570 (E.D.N.Y. 1985), *aff'd*, 821 F.2d 139 (2d Cir. 1987) (citing *Martindell*, 594 F.2d at 295). The court concluded, "After balancing the interests at stake, we are satisfied that, absent a showing of improvidence in the grant of a Rule 26(c) protective order or some extraordinary circumstance or compelling need, none of which appear here, a witness should be entitled to rely upon the enforceability of a protective order against any third parties, including the Government,

To Be Filed Under Seal

and that such an order should not be vacated or modified merely to accommodate the Government's desire to inspect protected testimony for possible use in a criminal investigation[.]" *Martindell*, 594 F.2d at 296.

Since *Martindell*, "It is well-settled [in this Circuit] . . . that a Rule 26(c) protective order may be overturned or modified [only] based on a finding of improvidence, extraordinary circumstances or compelling need." *Andover Data Servs., a Div. of Players Computer, Inc. v. Statistical Tabulating Corp.*, 876 F.2d 1080, 1083 (2d Cir. 1989). Moreover, the Second Circuit has held that *Martindell* applies to the Government, as well as to any other third party seeking to modify a protective order. *TheStreet.Com*, 273 F.3d at 229 n.7.

The Government argues that *Martindell* should not apply to the instant application, for three reasons. (Gov't Letter Br. at 3–5.)

First, it argues that the rule of *Martindell* is inapplicable because here the grand jury issued a valid and proper subpoena to Boies Schiller, while in *Martindell* the Government "'was proceeding outside of its usual investigative powers to secure the requested testimony, not by grand jury subpoena,' *Davis*, 702 F.2d at 422." (*See* Gov't Letter Br. at 3–4.) However, the statement from *Davis* that is quoted above concerned the testimony of a non-party appellant whose testimony was not subject to a Rule 26(c) protective order, but rather to an informal "understanding of confidentiality" that was never reduced to writing. *Davis*, 702 F.2d at 422. The opinion underscored that the parties' unwritten understanding about the confidentiality of this deponent's testimony would not trump a formal grand jury subpoena. That discussion is irrelevant to the question of whether this Court is required to apply the *Martindell* rule in evaluating this application.

Second, the Government argues that *Martindell* does not apply when "as here, the protective order is on its face temporary or limited." (Gov't Letter Br. at 4.) But the Protective Order in this case is at least arguably not temporary or limited. It would have expired had the case gone to trial, but, as the case settled, it appears to me to bind the parties permanently. It is true that nothing in the Protective Order seems to prevent either Giuffre or Maxwell from making public documents that were designated confidential *by that party* once the lawsuit is over. However, as to documents designated confidential *by the other party*, the promise of confidentiality plainly survives termination of the lawsuit—even to the point of requiring that those materials be returned or destroyed.

Third, the Government argues that applying *Martindell* to its application here "would risk rendering [*Martindell*] in even further conflict with the well-reasoned decisions of numerous other Circuits." (Gov't Letter Br. at 5 n.3.) *Martindell* is indeed an outlier; every other Circuit that has considered the clash between protective orders and grand jury subpoenas has questioned its wisdom and has come up with a standard more favorable to the Government's position. *See generally* Dane L. Steffenson, *Are Rule 26(c) Protective Orders Viable Against Grand Juries?*, 26 Golden Gate U. L. Rev. 183 (1996); 8A Fed. Prac. & Proc. Civ. § 2044.1 (3d ed. Nov. 2018). I happen to agree with the other Circuits, but *Martindell* is the law in this Circuit, and I am not at liberty to ignore it.

The Government argues that the Court should decline to analyze its request pursuant to *Martindell* in light of *Chemical Bank v. Affiliated FM Ins. Co.*, 154 F.R.D. 91 (S.D.N.Y. 1994). Like this case, *Chemical Bank* arose in a somewhat unusual posture: a party to a protective order unilaterally approached the Manhattan District Attorney's Office, "suggesting that it had evidence of criminal violations relating to the case." *Id.* at 93. The District Attorney then issued

a grand jury subpoena, with which the party (the defendant) complied. At no point did the defendant seek relief from the protective order. *Id.* When the other party to the protective order learned of the defendant's blatant disregard of its obligations, it moved for sanctions in the civil action. *Id.*

The district court condemned the defendant's behavior as "entirely unnecessary and inappropriate," but nonetheless refused to sanction the defendant—apparently because, had the defendant sought relief from that order, the judge would have granted its request. *Id.* at 93–94. While the *Martindell* factors were never mentioned expressly by the district court, Judge Broderick observed that the confidentiality order did not implicate "technological trade secrets, currently sensitive customer lists, or contemporarily sensitive competitive information which could benefit rivals"—factors that, if present, he would have had more difficulty balancing against the investigative needs of law enforcement. *Id.* at 94.

There are three reasons why *Chemical Bank* does not justify this Court's refusing to apply the *Martindell* factors to the Government's application. First and foremost, the opinion of another district judge does not trump an opinion from the Second Circuit. Second, while a reader of *Chemical Bank* cannot be certain whether the district court complied with *Martindell*, the language quoted above certainly suggests that the district court engaged in the balancing exercise that *Martindell* contemplated. Finally, nothing in the record suggests that the Government's investigation in this case was occasioned by Boies Schiller—a point to which I will return later in this opinion.

The Court will, therefore, analyze the Government's request in light of the *Martindell* factors.

To Be Filed Under Seal

### C.    On the Current Record, the Court Cannot Find That the Protective Order Was "Improvidently Granted"

Under *Martindell*, a Rule 26(c) protective order may be modified, for among other reasons, where a party can show "improvidence in the grant." 594 F.2d at 296. While the Government has not moved for modification on these grounds, I address this factor in light of the current proceedings before the Second Circuit.

The term is not well understood. *See United States v. Talco Contractors, Inc.*, 153 F.R.D. 501, 511 (W.D.N.Y. 1994) (observing that the Circuit "provided no guidance as to what might constitute 'improvidence in the grant of a . . . protective order'"). To date, the Second Circuit has identified two ways in which an order might be considered "improvidently granted." The first is, essentially, that it was issued in bad faith. However, this is a high bar. For example, a sealing order is "improvidently granted" where the presiding judge "reasonably should have recognized that [it] would facilitate or further criminal activity." *Palmieri*, 779 F.2d at 865–66. But there is absolutely no evidence that the district court harbored any such realization; indeed, at the time Judge Sweet entered the Order, it appeared that criminal activity against Maxwell and Epstein was a thing of the past.[4] Nothing in the record indicates that the entry of the Protective

---

[4]    In 2007, financier Jeffrey Epstein plead guilty to two prostitution charges in state court, arising from allegations that he "assembl[ed] a large, cult-like network of underage girls—with the help of young female recruiters" (including Maxwell)—whom he coerced into performing sex acts "behind the walls of his opulent waterfront mansion," among other locations, "as often as three times a day." Julie K. Brown, *How a future Trump Cabinet member gave a serial sex abuser the deal of a lifetime*, Miami Herald (Nov. 28, 2018), https://www.miamiherald.com/news/local/article220097825.html. The deal also included a non-prosecution agreement with the Department of Justice, which immunized Epstein and four named accomplices from all federal charges, broadly immunized "any potential co-conspirators," and—in contravention of federal law—kept the agreement secret from Epstein's victims. *Id.* Epstein served just thirteen months in county jail, during part of which he was permitted to continue working from his downtown office. *Id.*

In November 2018, the Miami Herald published a series of feature articles describing the allegations against Epstein and suggesting that the plea deal constituted Government misconduct. Liam Stack, *U.S. Opens Inquiry Into Handling of Jeffrey Epstein's Sex Abuse Case*, N.Y. Times (Feb. 6, 2019), https://www.nytimes.com/2019/02/06/us/fbi-jeffrey-epstein.html. The exposé garnered attention from the media and from Congress and has apparently prompted an investigation by the Department of Justice. *Id.* Whether the grand jury subpoena arose out of this renewed interest in Epstein's behavior is ultimately not relevant to the Court's decision—but it seems likely.

Order itself facilitated or furthered criminal activity; and the record contains no evidence of bad faith.

The second way in which a protective order might be "improvidently granted" is if the presiding judge did not require the moving party to show "good cause" for entering an order that permitted documents to be filed with the court under seal. It was long the law that the parties needed to make a document-by-document showing of good cause whenever discovery materials were filed with the court under seal. *In re Agent Orange Prod. Liab. Litig.*, 821 F.2d 139, 148 (2d Cir. 1987) (*Agent Orange*).

In recent years, however, the Second Circuit has relaxed the Rule 26(c) "good cause" showing for discovery materials that are never filed with the court, in light of changes to the Federal Rules of Civil Procedure. *TheStreet.Com*, 273 F.3d at 233 n.11. The new, more lax standard recognizes that, "Without an ability to restrict public dissemination of certain discovery materials *that are never introduced at trial*, litigants would be subject to needless annoyance, embarrassment, oppression, or undue burden or expense." *Iridium India Telecom Ltd. v. Motorola, Inc.*, 165 F. App'x 878, 881 (2d Cir. 2005) (summary order) (emphasis added) (quoting *TheStreet.Com*, 273 F.3d at 229).

As a result, the "good cause" showing necessary for entry of a blanket pretrial protective order like the one entered in *Giuffre* is not onerous. *Dorsett v. Cty. of Nassau*, 289 F.R.D. 54, 67 (E.D.N.Y. 2012). "[W]here "a protective order (1) is entered on a showing of good cause as required by Rule 26(c), (2) is limited to the context of pretrial civil discovery, and (3) does not restrict the dissemination of the information if gained from other sources," it is not improvidently granted. *Id.* (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 37 (1984)); *see also FragranceNet.com, Inc. v. FragranceX.com, Inc.*, No. 06-cv-2225, 2010 WL 11606632, at *4

(E.D.N.Y. Mar. 15, 2010) (order was not improvidently granted where "parties were concerned about exchanging commercially sensitive material with their direct competitors"). In fact, at least one district court in this Circuit has held that "stipulated, umbrella confidentiality orders are not *per se* improvident *even if good cause was not shown.*" *Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd.*, No. 05-cv-2745, 2010 WL 779314, at *4 (S.D.N.Y. Mar. 2, 2010) (emphasis added), *objections overruled*, No. 05-cv-2745, 2010 WL 1459178 (S.D.N.Y. Apr. 12, 2010), *aff'd*, 415 F. App'x 286 (2d Cir. 2011).

The Protective Order entered by Judge Sweet was certainly not "improvidently granted" under the standard articulated in *Dorsett*. The Protective Order was granted on the basis of legitimate privacy concerns on the part of both Giuffre and Maxwell, as well as third parties. *See In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 435 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994) (finding "no showing of improvidence where the justifications for the Protective Orders [were] immediately apparent"). Material turned over in discovery that was ultimately used at trial would have been publicly available. (Protective Order ¶ 13 ("This Protective Order shall have no force and effect on the use of any CONFIDENTIAL INFORMATION at trial in this matter.").) The Second Circuit may well be on the verge of making material used in connection with the summary judgment motions publicly available, though of course I cannot predict what order will ultimately issue from the Court of Appeals. And there does not appear to be any problem with the entry of a Protective Order that specifically contemplates case-by-case consideration of whether materials filed with the court should or should not be sealed.

I have no idea whether Judge Sweet made the requisite findings in his decisions granting the various motions to seal publicly-filed documents that were made in *Giuffre*. *See, e.g.*, *TheStreet.Com*, 273 F.3d 222, 231 (2d Cir. 2001) ("While *Martindell* established a general and

To Be Filed Under Seal

strong presumption *against access* to documents . . . we have held more recently in *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir.1995) ('*Amodeo I* '), that a subspecies of sealed documents in civil cases—so-called 'judicial documents'—deserve a presumption *in favor of access*.") (emphasis in original). That, I gather, is the subject of the pending appeal. Press reports of the oral argument suggest that perhaps the necessary findings might not have been made before certain court filings were sealed. I cannot and will not pretend not to know that the issue is out there. However, I know of no reason why it would have been improper to shield sensitive materials from public disclosure before any court filings were made.

> **D.** **If Any Party Relied on the Protective Order To Shield Confidential Materials from Disclosure to Law Enforcement, That Reliance Was Unreasonable**

Under *Martindell*, a court must consider the degree to which the party opposing unsealing (or, in this case, the party who could be expected to oppose unsealing) reasonably relied on the protective order. "Once a confidentiality order has been entered *and relied upon*, it can only be modified if an 'extraordinary circumstance' or 'compelling need' warrants the requested modification." *F.D.I.C. v. Ernst & Ernst*, 677 F.2d 230, 232 (2d Cir. 1982) (emphasis added) (internal quotation omitted).

I will assume, for purposes of argument, that Maxwell would oppose releasing Boies Schiller from the terms of the Protective Order in order to accommodate the grand jury subpoena; that is fairly obvious from her refusal to agree to a protective order that would have permitted Boies Schiller to comply with the subpoena without a court order authorizing compliance. I further assume she would argue that she relied on the Protective Order in deciding whether and how to comply with various discovery requests. The question to be decided is whether such reliance was reasonable.

16

"An examination of Second Circuit case law reveals the following factors are relevant when determining whether a party has reasonably relied on the protective order: (1) the scope of the protective order; (2) the language of the order itself; (3) the level of inquiry the court undertook before granting the order; and (4) the nature of reliance on the order." *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 255 F.R.D. 308, 318 (D. Conn. 2009).

The first factor—the scope of the Protective Order—favors granting the Government's application for modification. As discussed, the Protective Order was "a broad blanket order, stipulated to by the parties, which afforded the parties the discretion to designate whatever they produced as 'confidential.'" *Nielsen Co. (U.S.), LLC v. Success Sys., Inc.*, 112 F. Supp. 3d 83, 120 (S.D.N.Y. 2015). Blanket pretrial protective orders, drafted by the parties and "so ordered" by the court, are common. This case was no exception. "A broad protective order is less likely to elicit reliance 'because it is more difficult to show a party reasonably relied on a blanket order in producing documents or submitting to a deposition.'" *Id.* (quoting *EPDM*, 255 F.R.D. at 319).

The second factor—the language of the Protective Order itself—similarly weighs in favor of modification. The Protective Order provided that confidential information could be used at trial. (Protective Order, ¶¶ 4, 13.) As the Second Circuit has repeatedly held, a temporary or limiting provision in a protective order undercuts a finding of reasonable reliance, because from the outset there was the very real possibility that material produced in discovery would end up in the public record. *See, e.g.*, *Agent Orange*, 821 F.2d at 147. The very fact that material would have to be unsealed for trial undercuts a finding of reliance.

Additionally, where material contained in court filings is concerned, any expectation of confidentiality is necessarily grounded on the court's decision whether to grant the motion to seal (presumably after weighing the necessary factor)—*not* reliance on the protective order. And

17

while the Protective Order also had a permanent aspect about it—*i.e.*, it provides for the return or destruction of documents upon conclusion of the case (*see* Protective Order ¶ 12)—this provision neither trumped the law concerning the public's right of access to materials filed in court, nor specifically required the designating party to maintain confidentiality over its own designated materials once the Protective Order expired. (*See id.*)

Of course, this case contains an unusual fact that might seem to render Maxwell's reliance on a blanket Protective Order reasonable, as against even disclosure pursuant to a grand jury subpoena. We know that Maxwell refused to agree to any Protective Order containing a provision that is customary in all the protective orders entered by this Court: a provision permitting the production of confidential materials to law enforcement without further order of the court. (*See* Def.'s Reply in Further Supp. of Mot. for Protective Order, 15-cv-7433, Dkt. No. 49 at 5.) This might seem ironic, since Maxwell argued, in support of her motion for entry of a protective order, that prosecution of anyone based on Giuffre's allegations was unlikely. (*Id.*) But whether prosecution seemed likely or not, Maxwell did indeed bargain for such a provision; and for whatever reason, Giuffre and Boies Schiller agreed to it.

However, the Protective Order entered by Judge Sweet contains a provision that permits the court to order disclosure of Confidential Material in circumstances other than those listed in Paragraph 5 (a)–(h). *See* Protective Order ¶ 5 ("CONFIDENTIAL INFORMATION shall not, without the consent of the party producing it *or further Order of the Court*, be disclosed[.]") (emphasis added). All the list of exceptions at subparagraphs 5(a) through (h) does is indicate when there is no need for the opponent's consent or a court order before disclosure can be made. As the Protective Order plainly gives the court the power to enter an order compelling disclosure to anyone—law enforcement included—Maxwell could not reasonably have relied on the

To Be Filed Under Seal

absence of automatic permission for such disclosure to shield anything she said or produced from

a grand jury's scrutiny. As the court reasoned in *EPDM*, 255 F.R.D. at 321, language stating that

the party receiving designated confidential information "shall not use or disclose the information

except . . . by such orders as may be issued by the Court during the course of this litigation" did

"not lend itself to reasonable reliance that [the Protective Order] will afford permanent secrecy."

See also *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 126 (2d Cir. 2006), where, in view

of a provision that said, "This Confidentiality Order shall not prevent anyone from applying to

the Court for relief therefrom," the Second Circuit held, "Given this provision, it is difficult to

see how the defendants can reasonably argue that they produced documents in reliance on the

fact that the documents would always be kept secret."

Third, there is no evidence before me indicating that the court undertook any sort of

detailed inquiry prior to entering the Protective Order. (Hrg. Tr., 15-cv-7433, Dkt. No. 66 at

4:25–5:12.). Obviously, I was not there, but I have reviewed the transcript of the argument on

the motion for a protective order, and it seems clear that the parties were given ample discretion

to designate discovery materials as confidential, with virtually no oversight unless those

materials were to be filed with the court—in which case a motion for sealing had to be made.[5]

(Protective Order ¶ 10); *cf. Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 122 F.R.D. 433,

435 (S.D.N.Y. 1988) (declining to enforce protective order where "the protective order did not

adjudicate the appropriateness of confidentiality as to particular items of discovery"). The fact

---

[5]    "The question about a protective order, of course there should be a protective order in this case. You are good lawyers, and you have been around this track more times than I have and so you can prepare consensually a better protective order than I can, and I urge you to do that. And, in fact, I will give you two weeks to do that. Should you fail, you can present whatever materials you wish to me and I will decide what the protective order is going to be. That's not a good idea because you know the case better than I do, obviously, and so I urge you to resolve it by your litigation skills and not leave it up to the ignorant district court judge who doesn't really get into this kind of thing very often. So you run a risk if you leave it to me." (Hrg. Tr., 15-cv-7433, Dkt. No. 66 at 4:25–5:12.)

that confidentiality originated with the consent of the parties, and not with a judicial

determination that the materials at issue were deserving of protection, militates against a finding

of reasonable reliance. "[C]ourts have been reluctant to find reliance, or that reliance was

reasonable, where a protective order is, as here, a blanket order entered by stipulation of the

parties." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 164 F.R.D. 346, 356 (S.D.N.Y. 1996).

As for the last factor, the nature of the parties' reliance on the order does seem to weigh

against modification. "The classic situation in which a party 'relies' on a protective order is

where the party creates material during the course of the litigation on the understanding that it

will be kept confidential—for example, by . . . giving confidential testimony." *Allen v. City of

N.Y.*, 420 F. Supp. 2d 295, 300–01 (S.D.N.Y. 2006). The record shows that Giuffre likely could

not have secured Maxwell's deposition—at least in the absence of substantial court

involvement—without the Protective Order.[6] Maxwell specifically mentioned "the specter of

some theoretical prosecution" when arguing in support of the entry of her version of the

Protective Order. Although, as noted above, she discounted the likelihood of any such

prosecution (*see supra*, at 18.), she argued that, "A witness adverse to Plaintiff would be

reluctant to testify and may be bullied into asserting a Fifth Amendment privilege to avoid the

potential of information being forwarded to a prosecutor by the Plaintiff or her lawyers." (Def.'s

Reply in Further Supp. of Mot. for Protective Order, 15-cv-7433, Dkt. No. 49 at 5); *cf. Minpeco

S.A. v. Conticommodity Servs., Inc.*, 832 F.2d 739, 743 (2d Cir. 1987) ("[O]ne of the primary

reasons the protective order was originally entered was to prevent plaintiffs from using the threat

---

[6]     I cannot possibly second guess how Judge Sweet ran this litigation; he had far more experience than I and was justly respected for it. Had the case been before me, Maxwell would have been required to testify, or she would have been held in contempt or had issues resolved against her, Protective Order or no. And in every case in which I sign a protective order, I require the parties to agree to an addendum—the very terms of which would render blanket reliance on eternal confidentiality unreasonable. My practices make it difficult to put myself into Judge Sweet's shoes for purposes of this application. But do so I must.

To Be Filed Under Seal

of turning over their discovery to the government in order to coerce a settlement"). The parties also settled just a short time before trial; such a settlement could have been occasioned, at least in part, to avoid the public disclosure of any confidential materials.

However, the only thing on which Maxwell or anyone else might reasonably have relied is that Giuffre or her lawyers would not do what the defendant in *Chemical Bank* did—that is, forward discovery materials in their possession to prosecutors for the purpose of fomenting an investigation. But I am not faced with that situation. Nothing in this record suggests to me that Giuffre or Boies Schiller had anything to do with the Government's decision to convene a grand jury to look into the matters that were the subject of the *Giuffre* Action. On the contrary—the Government has advised the Court that it contacted Boies Schiller as part of its search for parties who might have been victims in its investigation; and that Boies Schiller told the Government that it could not consensually produce at least some documents in its files because of the existence of the Protective Order. There is no evidence of "collusion," to invoke a term of the moment, and it is quite clear that Boies Schiller did not foment the Government's investigation. Moreover, the Assistant United States Attorney has represented to this Court that he has no idea what is in Boies Schiller's files, and that for all he knows every witness who was deposed stood on his/her Fifth Amendment rights and refused to answer questions.

The literal terms of the Protective Order permit the court to authorize the release of Confidential Materials by parties to the Order "for good cause shown." (Protective Order, ¶ 14.) Any party who read the order had to be aware that it contained no promise that Confidential Materials would forever be withheld from a prosecuting agency—especially where, as here, a duly empowered grand jury seeks their production.

This decision accords with those of other courts in this Circuit. "Where a protective order contains express language that limits the time period for enforcement, anticipates the potential for modification, or contains specific procedures for disclosing confidential materials to non-parties, it is not reasonable for a party to rely on an assumption that it will never be modified." *EPDM*, 255 F.R.D. at 320. More to the point, "Uncertainty about the ultimate outcome of a protective order will mean that no deponent may always effectively rely on a protective order to secure his right against self-incrimination." *Andover Data Servs.*, 876 F.2d at 1084 (quoting *In re Grand Jury Subpoena*, 836 F.2d 1468, 1478 (4th Cir. 1988)).

Because Maxwell's reliance on the Protective Order to shield her from the court-ordered disclosure of Confidential Materials pursuant to a grand jury subpoena was unreasonable, the Court may exercise its discretion to grant the Government's application. "Where a litigant or deponent could not reasonably have relied on the continuation of a protective order, a court may properly permit modification of the order. In such a case, whether to lift or modify a protective order is a decision committed to the sound discretion of the trial court." *TheStreet.Com*, 273 F.3d at 231 (internal quotation omitted); *accord Gambale v. Deutsche Bank AG*, 377 F.3d 133, 142 n.7 (2d Cir. 2004) ("If reliance would be unreasonable, it is within the discretion of the court to vacate or modify a protective order.").

For the reasons discussed below, the Court finds that modification of the Protective Order is appropriate to aid law enforcement.

### E.    The Government Has Shown "Extraordinary Circumstances" That Warrant Modification of the Protective Order

The Government has persuasively demonstrated extraordinary circumstances, which would entitle it to modification in any event.

To Be Filed Under Seal

The term "extraordinary circumstances" is not well defined. *See Talco Contractors, Inc.*, 153 F.R.D. at 511. However, the Second Circuit has recognized that this requirement may be met in circumstances involving significant public interest, particularly where no good cause showing was made to the court initially. *See Agent Orange*, 821 F.2d at 148 ("exceptionally pervasive protection granted appellants during the pretrial stages of this litigation, coupled with the fact that appellants never were required to show good cause," as well as the fact that there was "enormous public interest in the Agent Orange litigation," demonstrated extraordinary circumstances); *but see Ionosphere Clubs*, 156 B.R. at 435 ("[M]ere breadth" of a protective order does not, by itself constitute "extraordinary circumstances."). Indeed, some district courts in this Circuit go one step further, holding that "The heightened *Martindell* 'extraordinary circumstances' standard . . . is not appropriate in cases with stipulated protective orders that grant parties open-ended and unilateral deference to protect whichever discovery materials they choose." *EPDM*, 255 F.R.D. at 321.

Here, as discussed, no party was required to make a good cause showing before designating any particular discovery materials as confidential. Moreover, there is significant public interest: the Government has convened a grand jury to investigate a serious crime (potentially involving multiple victims), which from its inception has garnered extensive publicity, and which (most recently) includes troubling allegations of misconduct on the part of Government officials, including a then-United States Attorney who is now a member of the President's Cabinet. The Court agrees with the Government that, because the investigation is not publicly known, "the ordinary exercise of grand jury power [*i.e.*, to subpoena witnesses to testify and to produce documents] . . . would implicate and invite the very risk of disclosure—and the possibility of alerting potential criminal targets that they are under investigation, causing them to

destroy evidence, flee from prosecution, or otherwise seriously jeopardize the Investigation—

that caused the Government to proceed via subpoena [to Boies Schiller] and its related

Application." (Gov't Letter Br. at 5.)

To be sure, the convenience of having potentially incriminating testimony readily

available does not in and of itself rise to the level of an extraordinary circumstance. In

*Martindell* itself, for example, the Second Circuit found no extraordinary circumstance because

"the Government, by discharging the grand jury investigating the matters in connection with

which the Government sought the witnesses' deposition transcripts, apparently chose not to use

grand jury investigative processes to obtain their testimony." 594 F.2d at 296 n.5. Therefore,

the mere unavailability of the information was not extraordinary. Similarly, in *Nosik v. Singe*, 40

F.3d 592 (2d Cir. 1994), the Circuit again declined to find that the Government had made a

showing of extraordinary circumstance, explaining, "[T]he possibility that [an individual] might

one day invoke the Fifth Amendment at her criminal trial does not automatically create for

prosecutors a compelling need for the testimony that [the individual] might have given [in the

civil proceeding] . . . [.] Prosecutors often make do without the testimony of a defendant." *Id.* at

595–96 (citing *Martindell*, 594 F.2d at 296).

Here, however, the extraordinary amount of publicity surrounding all aspects of what I

will call the Epstein matter does create practical limitations to the grand jury's ability to secure

certain information with the secrecy it requires to conduct an appropriately thorough and

thoughtful investigation. Moreover, it does not appear to this Court that we are in a situation in

which the Government seeks information merely to "ascertain the truth of much of what it has

independently discovered." *Minpeco*, 832 F.2d at 743. This is not a case, like *United States v.*

*Oshatz*, 700 F. Supp. 696, 703 (S.D.N.Y. 1988), where the Government was trolling for evidence

to use at a trial, rather than seeking information as part of a criminal investigation or grand jury proceeding. *See also Botha v. Don King Productions, Inc.*, No. 97-cv-7587, 1998 WL 88745, at *3 (S.D.N.Y. Feb. 27, 1998) ("[T]he Government may not use its 'awesome' investigative powers to seek modification of a protective order merely to compare the fruits of . . . discovery in a civil action with the results of a prosecutorial investigation in a criminal action.").

Additionally, the Government is not on a fishing expedition, merely hoping to inspect the protected materials for possible use in a future criminal investigation. In *Martindell*, 594 F.2d at 296, the Second Circuit concluded that the purported public interest in obtaining all relevant evidence was less than compelling in view of the Government's subpoena power. Here, however, a grand jury that is presently conducting an investigation has issued a subpoena for the production of documents as part of an ongoing investigation. The Government's interest is bolstered when the request is made by a grand jury, rather than informally by the United States Attorney. *See, e.g., In re Grand Jury Subpoena Duces Tecum Dated Oct. 29, 1992*, 1 F.3d 87, 94 n.4 (2d Cir. 1993). The Government's application is therefore based on more than a desire to "exploit[] . . . the fruits of private litigation." *Martindell*, 594 F.2d at 296. And the fact that the request comes from a grand jury, whose proceedings are by law conducted in secret, *In re Petition of Craig*, 131 F.3d 99, 101 (2d Cir. 1997), gives Maxwell the degree of protection that could reasonably be expected in the context of a criminal investigation.

Finally, while in other circumstances the breadth of the subpoena might be troubling, here the Government is in no position to narrow its request, because the *Giuffre* Action was litigated entirely almost under seal. *Cf. Grand Jury Subpoena Duces Tecum Dated Apr. 19, 1991*, 945 F.2d at 1223 (noting that a "lengthy report" of the bankruptcy examination, which included deposition excerpts, "was made available to the public"). The fact that the Second

Circuit—even before a final order disposing of the intervenors' appeal—has been critical of that fact, and has demanded an explanation for why it should not immediately unseal at least the materials filed in connection with the motion for summary judgment, lends force to the Government's request, despite its breadth.

For these reasons, the Government has demonstrated extraordinary circumstances warranting a modification of the Protective Order.

## III.    Conclusion

For the reasons stated above, the Court GRANTS the Government's application to modify the Protective Order, in order to permit Boies Schiller to comply with the subpoena.

The Clerk of Court is ORDERED to file this memorandum opinion and order under seal.

The Clerk of Court is also respectfully requested to close the open application at Docket Number 2.  All materials in this matter, 19 Misc. 149; are ORDERED to be kept under seal until further notice.

Dated: April 9, 2019

_____
                            Chief Judge

BY HAND TO AUSA ALEX ROSSMILLER

# UNITED STATES DISTRICT COURT
### FOR THE
## SOUTHERN DISTRICT OF NEW YORK
## CLERK'S OFFICE

SUBMITTED BY:    Plaintiff_____    Defendant_____

Attorney's Name: _____

Firm Name: _____

Address: _____

_____

Phone Number: _____

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

In re Grand Jury Subpoena

VS.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

CONTENTS:



19-MISC-149 (CM)

DOCKET NO.



# SEALED AND IMPOUNDED RECORD

DOC # 6

ORDERED SEALED AND IMPOUNDED AND PLACED IN A SECURED AREA IN THE CLERK'S OFFICE AND MAY NOT BE UNSEALED UNLESS ORDERED BY THE COURT.

ORDER DATED: 4/9/19

_____
U.S.D.J./U.S. MAGISTRATE JUDGE

RECEIVED BY _____

Re:   Sealed Memorandum (Decision and Order)